**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| DAVID M. KIRK,<br><br>    Plaintiff,<br><br>  v.<br><br>CITIGROUP GLOBAL MARKETS HOLDINGS INC.,<br><br>    Defendant. | No. 20-cv-7619 (ALC) |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S**
**MOTION TO DISMISS PLAINTIFF'S FINAL AMENDED COMPLAINT**

**GOODWIN PROCTER LLP**

Marshall H. Fishman
Samuel J. Rubin
The New York Times Building
620 Eighth Avenue
New York, New York 10018
Telephone: (212) 813-8800
Facsimile: (212) 355-3333

*Attorneys for Defendant Citigroup Global Markets Holdings Inc.*

## <u>TABLE OF CONTENTS</u>

**Page**

PRELIMINARY STATEMENT ................................................................................. 1

STATEMENT OF FACTS ...................................................................................... 3

    The 3x Long Crude Oil Exchange Traded Notes................................................. 3

    Indicative Value and Trading Prices.................................................................. 5

    Plaintiff's Trading in the UWT Notes ............................................................... 6

    The Amended Complaint ................................................................................. 7

ARGUMENT ...................................................................................................... 8

I.     THE COURT LACKS SUBJECT MATTER JURISDICTION........................................ 8

    A.     The Amended Complaint Fails to Establish Diversity Jurisdiction...................... 8

    B.     The Amended Complaint Fails to Establish Federal Question Jurisdiction. ....... 11

II.    THE AMENDED COMPLAINT FAILS TO STATE A CLAIM. ................................... 12

    A.     The Amended Complaint Fails to Plead Common Law Fraud........................... 13

          1.     The Amended Complaint Fails to  Plead a Material Misstatement
                or Omission. ........................................................................................ 14

          2.     The Amended Complaint Fails to Plead Scienter or Intent to
                Defraud. ............................................................................................ 16

          3.     The Amended Complaint Fails to Plead Reasonable Reliance on
                any Material Misstatement or Omission. ................................................. 18

          4.     The Amended Complaint Fails to Plead Loss Causation......................... 19

CONCLUSION................................................................................................. 20

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Acito v. IMCERA Grp., Inc.*,
47 F.3d 47 (2d Cir. 1995)......................................................................16

*Amidax Trading Grp. v. S.W.I.F.T. SCRL*,
671 F.3d 140 (2d Cir. 2011)...................................................................3

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)...........................................................................12, 13

*Axar Master Fund, Ltd. v. Bedford*,
806 F. App'x 35 (2d Cir. 2020).............................................................14

*Bank of Am., N.A. v. Bear Stearns Asset Mgmt.*,
969 F. Supp. 2d 339 (S.D.N.Y. 2013)...................................................19

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)...........................................................................12, 13

*Carling v. Peters*,
2013 WL 865842 (S.D.N.Y. Mar. 8, 2013) ..........................................9

*Chill v. G.E. Co.*,
101 F.3d 263 (2d Cir. 1996)...................................................................17

*Cohen v. Narragansett Bay Ins. Co.*,
2014 WL 4701167 (E.D.N.Y. Sept. 23, 2014) ......................................9

*In re Deutsche Bank Aktiengesellschaft Sec. Litig.*,
2007 WL 4049253 (S.D.N.Y. June 28, 2017) ......................................17

*Fin. & Trading, Ltd. v. Rhodia SA*,
2004 WL 2754862 (S.D.N.Y. Nov. 30, 2004).......................................12

*First Nationwide Bank v. Gelt Funding Corp.*,
27 F.3d 763 (2d Cir. 1994).....................................................................20

*Fritz v. Warner Lambert Pharma Co.*,
349 F. Supp. 1250 (E.D.N.Y. 1972) ......................................................10

*Ge Dandong v. Pinnacle Performance Ltd.*,
2013 WL 5658790 (S.D.N.Y. Oct. 17, 2013) ........................................18

*John Wiley & Sons, Inc. v. Glass*,
    2010 WL 1848226 (S.D.N.Y. May 7, 2010) ........................................................10

*Kalnit v. Eichler*,
    264 F.3d 131 (2d Cir. 2001)................................................................................17

*Kruglov v. Copart of Conn., Inc.*,
    771 F. App'x 117 (2d Cir. 2019) ...................................................................9, 10

*Ladenburg Thalmann & Co. v. Imaging Diagnostic Sys., Inc.*,
    176 F. Supp. 2d 199 (S.D.N.Y. 2001)..................................................................9

*Lerner v. Fleet Bank, N.A.*,
    459 F.3d 273 (2d Cir. 2006)................................................................................13

*Lombardi v. Peace*,
    259 F. Supp. 222 (S.D.N.Y. 1966) ....................................................................12

*M&T Bank Corp. v. LaSalle Bank Nat'l Ass'n*,
    852 F. Supp. 2d 324 (W.D.N.Y. 2012) ..............................................................16

*Matsumura v. Benihana Nat'l Corp.*,
    542 F. Supp. 2d 245 (S.D.N.Y. 2008).................................................................16

*Metro. Trans. Auth. v. Fed. Energy Reg. Comm.*,
    796 F.2d 584 (2d Cir. 1986)................................................................................20

*Nwanza v. Time, Inc.*,
    125 F. App'x 346 (2d Cir. 2005) ...................................................................9, 11

*Olkey v. Hyperion 1999 Term Trust, Inc.*,
    98 F.3d 2 (2d Cir. 1996)......................................................................................19

*People United for Children, Inc. v. City of New York*,
    108 F. Supp. 2d 275 (S.D.N.Y. 2000)..................................................................8

*Premium Mortg. Corp. v. Equifax, Inc.*,
    583 F.3d 103 (2d Cir. 2009)................................................................................13

*Roginsky v. Richardson-Merrell, Inc.*,
    378 F.2d 832 (2d Cir. 1967)................................................................................10

*Rubinstein v. Credit Suisse Grp.*,
    457 F. Supp. 3d 289 (S.D.N.Y. 2020).................................................................19

*Set Capital LLC v. Credit Suisse Grp.*,
    2019 WL 3940641 (S.D.N.Y. Aug. 16, 2019) ........................................ 16-17, 19

*TeeVee Toons v. Gerhard Schubert GmbH*,
  2006 WL 2463537 (S.D.N.Y. Aug. 23, 2006) ........................................................10

*Tongkook Am., Inc. v. Shipton Sportswear Co.*,
  14 F.3d 781 (2d Cir. 1994) ..............................................................................8

*In re TVIX Sec. Litig.*,
  25 F. Supp. 3d 444 (S.D.N.Y. 2014) ...........................................................18, 19

*Valle v. Bally Total Fitness*,
  2003 WL 22244552 (S.D.N.Y. Sep. 30, 2003) ................................................12

*In re Wachovia Equity Sec. Litig.*,
  753 F. Supp. 2d 326 (S.D.N.Y. 2011) ...........................................................16

*Y-Gar Capital LLC v. Credit Suisse Grp. AG*,
  2020 WL 71163 (S.D.N.Y. Jan. 2, 2020) .....................................................17, 19

*Z-Axis Tech Sols., Inc. v. Richmond Cap. Grp.*,
  2018 WL 1088008 (S.D.N.Y. Feb. 14, 2018) ............................................8, 9, 10

**Statutes**

15 U.S.C. § 77v ...........................................................................................12

15 U.S.C. § 78aa .........................................................................................12

28 U.S.C. § 1331 ....................................................................................11, 12

28 U.S.C. § 1332 ..........................................................................................8

**Other Authorities**

Fed. R. Civ. P. 8 .........................................................................................1, 2

Fed. R. Civ. P. 9 .........................................................................................1, 2

Fed. R. Civ. P. 12 ....................................................................................1, 2, 12

Citigroup Global Markets Holdings Inc. ("CGMHI") respectfully submits this memorandum of law in support of its motion pursuant to Federal Rules of Civil Procedure 8(a), 9(b), 12(b)(1) and 12(b)(6) to dismiss the Final Amended Complaint (the "Amended Complaint" or "Compl.") filed by David M. Kirk ("Plaintiff").

## PRELIMINARY STATEMENT

Based on the allegations in the Amended Complaint and documents annexed thereto, Plaintiff is an investor who went long on energy-sector securities. In March 2020—among hundreds of other securities transactions and more than one million dollars in total transaction volume—Plaintiff traded in the secondary market for exchange traded notes issued by CGMHI that were "highly risky," "highly speculative" and designed only for "sophisticated investors" seeking leveraged-long exposure to crude oil markets on a daily basis.

As crude oil markets declined, Plaintiff divested his position on March 19, 2020.[1] He realized an approximate $14,000 cash payout, which he claims reflects an approximate $17,000 loss when it is compared against what Plaintiff alleges was the "fair price" for the notes two days prior (on March 17).

The Amended Complaint fails to allege that CGMHI was a broker or dealer in any of Plaintiff's transactions; nor does it allege that CGMHI determined the trading prices at which Plaintiff bought or sold his exchange traded notes on the NYSE through his online E-Trade brokerage account in the secondary market. Nonetheless, through this action, Plaintiff attempts

---

[1]     The Amended Complaint implies that Plaintiff was "forced to sell" his UWT Notes due to CGMHI's optional right to accelerate the notes, which CGMHI also exercised on March 19, 2020. Compl. ¶ 5. But the Amended Complaint and documents annexed thereto confirm that CGMHI did not redeem Plaintiff's notes. Rather, Plaintiff voluntarily divested his entire position in the exchange traded notes at issue by selling them in the secondary market (through his E-Trade online brokerage account) earlier in the day on March 19, 2020. *Id.*; *see also* Compl. Ex. B (ECF No. 1-2) at 22.

to manufacture a fraud claim to recoup his trading losses.  Plaintiff's claim is without merit and should be dismissed for several reasons.

As a threshold matter, Plaintiff's alleged losses are far below the $75,000 threshold for diversity of citizenship jurisdiction.  Plaintiff attempts to make up the difference by alleging $393,300 (or 22.5 times the alleged trading losses) in punitive damages.  But punitive damages are not available in ordinary common law fraud cases, which is the only claim the Amended Complaint advances.  Courts in this Circuit are skeptical of (and closely scrutinize) punitive damages allegations advanced to support otherwise jurisdictionally-defective diversity claims, which is precisely what Plaintiff attempts to assert here.  The Amended Complaint fails to establish diversity jurisdiction, or federal question jurisdiction (to the extent it is pleaded), as a basis for subject matter jurisdiction.

And, even putting jurisdictional deficiencies aside, the Amended Complaint fails to state a claim upon which relief can be granted under Rule 12(b)(6).  It fails to plead the requisite elements of fraud with the particularity required under Rule 9(b).  It identifies no misstatement or omission, nor does it state when, where, or who made any such an alleged statement.  It contains no allegations that any statement or omission was made with fraudulent intent, or how any such statement or omission was relied upon in a way that caused losses to Plaintiff.  Nor could it because, as several courts in this District have observed in dismissing similar cases, the operative offering documentation forecloses exactly the type of claim Plaintiff attempts to bring.

The Amended Complaint should be dismissed, in its entirety, pursuant to Federal Rules of Civil Procedure 8(a), 9(b), 12(b)(1) and 12(b)(6), as set forth herein.

## STATEMENT OF FACTS

### The 3x Long Crude Oil Exchange Traded Notes

Through his E-Trade brokerage account, Plaintiff purchased, on the secondary market, exchange traded notes ("ETNs") issued by CGMHI.  Compl. ¶ 5.  The ETNs were the "3x Long Crude Oil ETNs," which traded under the NYSE ticker, "UWT" (the "UWT Notes").  *Id.* ¶ 4.

The UWT Notes were issued pursuant to a prospectus pricing supplement, as amended and dated March 18, 2020 (the "Pricing Supplement").[2]  As set forth in the Pricing Supplement, the UWT Notes were designed for sophisticated investors seeking daily leveraged long exposure to the S&P GSCI® Crude Oil Index ER (the "Index").  Rubin Decl., Ex. A at 1.

The Pricing Supplement disclosed risks associated with the UWT Notes including—in bold emphasis on the first page—that:

> **The ETNs are not intended to be "buy and hold" investments. The ETNs are intended to be daily trading tools for sophisticated investors to manage daily trading risks. They are designed to achieve their stated investment objectives on a daily basis, but their performance over different periods of time can differ significantly from their stated daily objectives.**
>
> **The ETNs are riskier than securities that have intermediate- or long-term investment objectives, and may not be suitable for investors who plan to hold them for a period other than one day. Any decision to hold the ETNs for more than one day should be made with great care and only as the result of a series of daily (or more frequent) investment decisions to**

---

[2]    The facts alleged in the Amended Complaint are taken as true only for purposes of this motion to dismiss.  The Amended Complaint is "deemed to include any written instrument attached to it as an exhibit, materials incorporated in it by reference, and documents that, although not incorporated by reference, are integral to the complaint."  *See, e.g.*, *Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 145 (2d Cir. 2011) (quoting *Sira v. Morton*, 380 F.3d 57, 67 (2d Cir. 2004).  The Pricing Supplement is referred to and incorporated into the Amended Complaint.  Compl. ¶¶ 7-8.  A copy of the Pricing Supplement is annexed to the January 20, 2021 Declaration of Samuel J. Rubin ("Rubin Decl."), at Exhibit A.  Page citations to the Pricing Supplement refer to the page numbers appearing on the lower right hand corner of the document and referring to pages "__/86" of the Pricing Supplement.

> **remain invested in the ETNs for the next one-day period. Accordingly, the ETNs should be purchased only by knowledgeable investors who understand the potential consequences of an investment linked to the Index and of seeking daily compounding leveraged long or leveraged inverse investment results, as applicable.  Investors should actively and frequently monitor their investments in the ETNs, even intraday.  *If you hold the ETNs for more than one day, it is possible that you will suffer significant losses in the ETNs even if the performance of the Index over the time you hold the ETNs is positive, in the case of the Leveraged Long ETNs, or negative, in the case of the Leveraged Inverse ETNs.*

*Id.* (emphases in original).  The Pricing Supplement further explained that:

> Unlike ordinary debt securities, the ETNs do not offer interest payments and do not guarantee any return of principal at maturity or upon earlier redemption or acceleration.  Instead, each series of ETNs is designed for investors who seek leveraged long or leveraged inverse, as applicable, exposure to the performance of the [S&P GSCI® Crude Oil Index] on a daily basis plus the Daily Accrual and *minus* the Daily Investor Fee, as described below.  **At maturity or upon early redemption or acceleration, holders of each ETN will receive an amount in cash that will vary depending on the level of the Index as described below, which can be significantly less than the stated principal amount of the applicable ETNs and could be zero**.

*Id.* (emphasis added).

The Pricing Supplement further reiterated these risks, and many others, in a "Risk Factors" section providing further disclosures that:

- "**The ETNs do not pay interest or guarantee any return of your initial investment and you may lose all or a significant part of your investment in the ETNs.**"  *Id.* at 29 (emphasis in original).

- "**The ETNs will magnify any adverse movements in the closing level of the Index by 3 times and, therefore, are highly speculative and highly risky.**"  *Id.* (emphasis in original).

- "[I]f the Index moves by 3.33% in an adverse direction, the ETNs will lose 10% of their value, and if the Index moves by 33.33% in an adverse direction, the ETNs will lose all of their value, all within a one-day period. Accordingly, the ETNs **are highly speculative and highly risky and are suitable only for sophisticated investors who understand and can bear the**

**risks associated with 3 times magnified losses resulting from adverse movements in the daily performance of the Index**." *Id.* (emphasis added).

- "***Therefore, it is possible that you will suffer significant losses in the Leveraged Long ETNs even if the long-term performance of the Index is positive. It is possible for the level of the Index to increase over time while the market value of the Leveraged Long ETNs declines over time. In addition, it is possible that you will suffer significant losses in the Leveraged Inverse ETNs even if the long-term performance of the Index is negative. It is possible for the level of the Index to decrease over time while the market value of the Leveraged Inverse ETNs declines over time. <u>You should proceed with extreme caution in considering an investment in the ETNs</u>***." *Id.* at 29-30 (emphases in original).

The Pricing Supplement also disclosed additional risk factors specifically related to the

UWT Notes' derivation of value from crude oil markets, which are especially volatile:

- "**The Index may be more volatile and will be more susceptible to fluctuations in the price of a single commodity than a broader commodities index.**" *Id.* at 46 (emphasis in original).

- "**The price of crude oil futures can exhibit high and unpredictable volatility, which could lead to high and unpredictable volatility in the Index.**" *Id.* (emphasis in original).

- "The potential for high volatility and the cyclical nature of commodity markets may render an investment in crude oil futures inappropriate as the focus of an investment portfolio." *Id.*

- "In the event of sudden disruptions in the supplies of oil, such as those caused by war, natural events, accidents or acts of terrorism, prices of oil futures contracts could become extremely volatile and unpredictable." *Id.* at 47.[3]

### Indicative Value and Trading Prices

The Pricing Supplement also disclosed that, because the UWT Notes were traded in the

secondary market, the UWT Notes' "indicative" value ("Indicative Value")—used to calculate

---

[3] Additionally, although Plaintiff voluntarily divested his position before any acceleration of the UWT Notes (*see* n.1, *supra*), the Pricing Supplement also explained that CGMHI had no obligation to maintain the UWT Notes, which could be accelerated at any time. Rubin Decl., Ex. A. at 5 ("We may elect to discontinue the listing of the ETNs at any time and for any reason, including in connection with a decision to discontinue further issuances and sales of the ETNs.").

payouts at redemption or maturity, among other things—was "not the same as the trading price." *Id.* at 16. The Indicative Value "is based on the most recent intraday level of the Index at the particular time." *Id.* at 9. "The Intraday Indicative Value is a calculated value and is not the same as the trading price of the ETNs and is not a price at which you can buy or sell the ETNs in the secondary market." *Id.*

Trading prices were "market-determined." *Id.* at 18. The Pricing Supplement explained that the "**actual trading price of the ETNs in the secondary market may vary significantly from their Intraday Indicative Value**" and that the "**market price of the ETNs may be influenced by many unpredictable factors**." *Id.* at 9, 38 (emphases in original). It described those unpredictable factors to include: (i) the "level of the Index" at any time and "volatility" and "liquidity" of the "futures contracts included in the Index"; (ii) "economic, financial, regulatory, political, judicial, military and other events that affect commodities markets generally"; and (iii) the "supply and demand for the ETNs in the secondary market" and "global supply and demand for crude oil." *Id.* at 38.

### Plaintiff's Trading in the UWT Notes

Based on the face of the Amended Complaint and brokerage statements annexed thereto, Plaintiff trades extensively. Compl. Ex. B (ECF No. 1-2). In March 2020 alone, Plaintiff executed nearly three hundred securities transactions totaling over $1 million in value. *Id.*

He traded every day the market was open. *Id.* He traded on margin. *Id.* He established long positions in the energy-sector including by purchasing gas-linked ETNs issued by other financial institutions. *Id.* On six days (March 6, 10-11, 13, 17 and 19), Plaintiff traded UWT Notes on the secondary market at trading prices available on the NYSE, holding those notes for

various durations and, in some circumstances, trading and realizing intra-day profits. *Id.* at 14-15, 17-22.

As of March 17, 2020 (the day before Plaintiff alleges any fraud began), Plaintiff was holding 37,500 UWT Notes. *Id.* Two days later (March 19), he purchased an additional 12,500 UWT Notes, increasing his position to 50,000 UWT Notes. *Id.* at 22. Later that same day, Plaintiff liquidated his entire position in the secondary market, realizing a market price payout of $14,607.45, which Plaintiff claims reflects a loss of $17,438 when compared to what he claims was the "fair price" had he not held his position beyond March 17, 2020. *Id.*[4] As alleged in the Amended Complaint, all of Plaintiff's transactions were secondary market transactions executed on the NYSE through Plaintiff's E-Trade brokerage account. Compl. (ECF No. 1) § III and Ex. B (ECF No. 1-2); *see also* Compl. ¶¶ 1, 5-7.

## The Amended Complaint

Plaintiff filed the original complaint in this Court on September 17, 2020 (ECF No. 1) and after pre-motion correspondence pursuant to the Court's Individual Practices, amended that complaint on December 3, 2020 (ECF No. 21). Plaintiff amended that amended complaint again (without leave of Court or Defendant's consent) on December 29, 2020 (ECF No. 22).[5]

The Amended Complaint advances no formal claims for relief or federal statutory private rights of action. It claims a fraud occurred on March 18-19, 2020 in connection with Plaintiff's sale of UWT Notes from his online E-Trade brokerage account. Compl. (ECF No. 1) § III and

---

[4]      In addition to numerous other jurisdictional and pleading deficiencies set forth herein, the $17,438 calculation is mathematically incorrect because it includes the 12,500 UWT Notes that Plaintiff purchased on March 19 and sold the same day at an intra-day trading profit. Excluding those 12,500 UWT Notes further reduces the alleged trading losses to approximately $13,000.

[5]      The Amended Complaint states that it "is meant to be taken in addition to the rest" of the original September 17, 2020 complaint (ECF No. 1) including the exhibits thereto. *See* Compl. pg. 1 (preamble). Paragraph references herein shall refer to the Amended Complaint filed at ECF No. 22 unless otherwise stated to refer to incorporated portions of ECF No. 1.

(ECF No. 22) ¶¶ 1, 9.  Specifically, Plaintiff alleges that his UWT Notes were "not tracking" the Index and that, had such "fraudulent tracking" not occurred, he could have achieved a higher market price in the secondary market.  Compl. ¶¶ 3, 5.  Plaintiff also seeks damages for his lost opportunity to time the market, alleging he "had very little time to wait for UWT to rebound at a time when oil was at an extreme low" and seeks $43,300 for his total UWT Note position (irrespective of trading losses allegedly realized) and $393,300 in punitive damages.  *Id.* ¶¶ 5, 10.

## ARGUMENT

### I.      THE COURT LACKS SUBJECT MATTER JURISDICTION.

#### A.      The Amended Complaint Fails to Establish Diversity Jurisdiction.

United States "district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between . . . citizens of different States."  28 U.S.C. § 1332(a)(1).  The "party invoking the benefit of federal jurisdiction bears the burden of establishing the existence of that jurisdiction." *Z-Axis Tech Sols., Inc. v. Richmond Cap. Grp.*, No. 17-cv-3983 (GBD), 2018 WL 1088008, at *1 (S.D.N.Y. Feb. 14, 2018).  That party "has the burden of proving that it appears to a 'reasonable probability' that the claim is in excess of the statutory jurisdictional amount."  *Tongkook Am., Inc. v. Shipton Sportswear Co.*, 14 F.3d 781, 784 (2d Cir. 1994).

In assessing that probability, courts will "refrain from drawing any inferences in favor of the party asserting jurisdiction."  *People United for Children, Inc. v. City of New York*, 108 F. Supp. 2d 275, 283 (S.D.N.Y. 2000).  And, although courts recognize a rebuttable presumption that amounts alleged are a "good faith representation of the actual amount in controversy," that presumption erodes where it is legally certain such amounts are unavailable under applicable state law.  *Z-Axis*, 2018 WL 1088008, at *3.

8

Courts are "not compelled to accept a claim for punitive damages made for the purposes of conferring jurisdiction." *Id.* (citing *Career Init. Corp. v. Palmer*, 893 F. Supp. 295, 296 (S.D.N.Y. 1995)); *see also Cohen v. Narragansett Bay Ins. Co.*, No. 14-CV-3623, 2014 WL 4701167, at *3 n.4 (E.D.N.Y. Sept. 23, 2014) (observing that the court was "not obligated to accept, on face value, a claimed amount of punitive damages, particularly where there would be no diversity without such damages" (citations omitted)).   Indeed, when punitive damages are used to satisfy the diversity jurisdiction requirement, courts will review them "with greater scrutiny than claims for actual damages . . . ." *Z-Axis*, 2018 WL 1088008, at *3 (citing *Zahn v. Int'l Paper Co.*, 469 F.2d 1033, 1034 n.1 (2d Cir. 1972)).[6]

Under New York law, "punitive damages are not available in an ordinary fraud case," which is the only claim the Amended Complaint purports to assert. *Ladenburg Thalmann & Co. v. Imaging Diagnostic Sys., Inc.*, 176 F. Supp. 2d 199, 207 (S.D.N.Y. 2001) (striking punitive damages claim because "under New York law, punitive damages are not available in an ordinary fraud case").[7]   For example, in *Kruglov v. Copart of Connecticut, Inc.*, 771 F. App'x 117, 120 (2d Cir. 2019) (Summary Order), the Second Circuit affirmed a dismissal for lack of subject matter jurisdiction where the plaintiff sought to include punitive damages in the monetary

---

[6]     *See also Carling v. Peters*, No. 10 Civ. 4573 (PAE)(HBP), 2013 WL 865842, at *5 (S.D.N.Y. Mar. 8, 2013) (adopting recommendation of dismissal of fraud claims seeking punitive damages due to lack of subject matter jurisdiction and observing that, as the "Second Circuit has cautioned, a district court, in determining whether claimed punitive damages count towards the jurisdictional threshold, must examine claims for punitive damages with closer scrutiny than claims for actual damages." (citing *Nwanza v. Time, Inc.*, 125 F. App'x 346, 349 (2d Cir. 2005) and *Zahn*, 469 F.2d at n.1)).

[7]     New York law applies because federal courts sitting in diversity apply the choice-of-law principles of the forum state and, under "New York law, a court must apply the substantive tort law of the state that has the most significant relationship with the occurrence and with the parties." *See, e.g.*, *TeeVee Toons v. Gerhard Schubert GmbH*, No. 00 Civ. 5189 (RCC), 2006 WL 2463537, at *14 (S.D.N.Y. Aug. 23, 2006) (internal quotation and citation omitted). Plaintiff alleges the purportedly fraudulent conduct occurred in New York on the New York Stock Exchange on March 18 and March 19, 2020.  *See* Compl. (ECF No. 1) § III.

threshold based on allegations of fraud because "[p]unitive damages are 'refused in the 'ordinary' fraud and deceit case'" under New York law.  *Id.* (citing *Walker v. Sheldon*, 10 N.Y.2d 401, 405 (1961)).

Extraordinary cases of fraud are those where "the fraud is aimed at the public generally, is gross, and involves high moral culpability."  *Z-Axis*, 2018 WL 1088008, at *3 (citations omitted).  The "misconduct must be egregious" and "characterized as 'gross' and 'morally reprehensible,'" or involve "such wanton dishonesty as to imply a criminal indifference to civil obligations."  *Id.*[8]

The Amended Complaint seeks an alleged $17,438 (or at most $43,300) in losses based on a common law fraud claim (Compl. ¶¶ 5, 9, 11), far below the statutory threshold to establish diversity jurisdiction.  While the Amended Complaint seeks $393,300 in punitive damages (*see id.* ¶ 10), punitive damages are not available under an ordinary fraud claim, and Plaintiff's allegations fail to plead a case for extraordinary fraud.

Indeed, as set forth below (*see* § II, *infra*), the Amended Complaint fails to state a claim for fraud at all, let alone an egregious fraud that would support including punitive damages:

- The UWT Notes were purchased by an experienced and sophisticated investor through an online brokerage account (E-Trade) without any trading relationship (or alleged interaction) with CGMHI.  *See* § II.A, *infra*.

---

[8]    Courts within this Circuit observe that conduct tantamount to criminality permeates the punitive damages analysis under New York law.  *See John Wiley & Sons, Inc. v. Glass*, No. 10 Civ. 598 (PKC), 2010 WL 1848226, at *3 (S.D.N.Y. May 7, 2010) ("Under New York law, punitive damages are not awarded as a matter of course, even on claims of fraud.  Generally, punitive damages have been limited to conduct evincing a high degree of moral turpitude and demonstrating such wanton dishonesty as to imply a criminal indifference to civil obligations." (internal citations omitted); *see also Fritz v. Warner Lambert Pharma Co.*, 349 F. Supp. 1250, 1252 (E.D.N.Y. 1972) ("As pointed out by Judge (now Chief Judge) Friendly in *Roginsky v. Richardson-Merrell, Inc*., 378 F.2d 832, 843 (2d Cir. 1967), permeating the New York rule is the requirement that the conduct which 'will give rise to punitive damages must be close to criminality. . . .'").

- The Amended Complaint alleges no particular misrepresentation or omission relied upon by Plaintiff in purchasing the UWT Notes, and certainly not with the specificity required under Federal Rule 9(b).  *Id.*

- The Indicative Value of the UWT Notes was not calculated by CGMHI, and the calculation agent that computed Indicative Value is not party to this lawsuit.  *Id.*  Furthermore, the Amended Complaint bases Plaintiff's alleged losses not on Indicative Value but on trading prices realized in the secondary market.  Compl. ¶¶ 5-7.

- The purported investment losses alleged in the Amended Complaint correspond to the risks disclosed in the Pricing Supplement and occurred during precipitous declines in oil and gas markets generally, and numerous courts in this District have dismissed similar claims based on similar disclosures.  *See* § II.A, *infra*.

Accordingly, Plaintiff's attempt to ratchet up his alleged actual trading losses (approximately 22.5 times) to satisfy the jurisdictional threshold should be rejected.  *See, e.g.*, *Nwanza*, 125 F. App'x at 349.

**B.      The Amended Complaint Fails to Establish Federal Question Jurisdiction.**

The Amended Complaint also fails to establish federal question jurisdiction under 28 U.S.C. § 1331, to the extent it is invoked by the Amended Complaint.[9]  Section 1331 provides that "district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."  28 U.S.C. § 1331.

The Amended Complaint references Section 22(a) of the Securities Act and 27(a) of the Exchange (*see* Compl. ¶ 1), which create subject matter jurisdiction for claims brought under

---

[9]      It is unclear if the Amended Complaint intends to invoke federal question jurisdiction. The cover page of the complaint (ECF No. 1) incorporated into the Amended Complaint (ECF No. 22) identifies only "diversity jurisdiction."  *See* ECF No. 1 § III.  The Amended Complaint's preamble similarly references only "diversity of citizenship," and the Amended Complaint makes no mention of 28 U.S.C. § 1331.  Compl. pg. 1 (preamble).  But the Amended Complaint states the Court has subject matter jurisdiction pursuant to Section 22(a) of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. § 77v(a), and Section 27(a) of the Securities and Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78aa(a).  Compl. ¶ 1.

those federal statutes.[10]  But the Amended Complaint advances no claim under either statute, which is alone grounds to reject the application of federal question jurisdiction here.  *See, e.g.*, *Fin. & Trading, Ltd. v. Rhodia SA*, No. 04 Civ. 6083 (MBM), 2004 WL 2754862, at *4 (S.D.N.Y. Nov. 30, 2004) ("The plaintiff is the master of the complaint, and is 'free to avoid federal jurisdiction by pleading only state claims even where a federal claim is also available.'") (citing *Marcus v. AT & T Corp.*, 138 F 3d 46, 52 (2d Cir. 1998)); *Valle v. Bally Total Fitness*, No. 01-cv-11614 (RCC)(KNF), 2003 WL 22244552, at *3 (S.D.N.Y. Sep. 30, 2003) (dismissing complaint and holding that the "principal purpose of the pleading is to give the adverse party fair notice of the claim asserted so that a defendant will not have to speculate about its basis") (citing Fed. R. Civ. P. 8(a)(2)).[11]

*          *          *

The Amended Complaint fails to meet Plaintiff's burden to establish the Court's subject matter jurisdiction and must be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(1).

## II.      THE AMENDED COMPLAINT FAILS TO STATE A CLAIM.

To survive a motion to dismiss under Federal Rule 12(b)(6), "a complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

---

[10]      *See* 15 U.S.C. § 77v(a) ("The district courts of the United States . . . shall have jurisdiction . . . of all suits in equity and actions at law brought to enforce any liability or duty created by this subchapter."); 15 U.S.C. § 78aa(a) ("The district courts of the United States . . . shall have exclusive jurisdiction of violations of this chapter or the rules and regulations thereunder, and of all suits in equity and actions at law brought to enforce any liability or duty created by this chapter or the rules and regulations thereunder.").

[11]      *See also Lombardi v. Peace*, 259 F. Supp. 222, 224 (S.D.N.Y. 1966) ("It is clear that federal jurisdiction under 28 U.S.C. § 1331 cannot be sustained on the bare allegation that the claim arises 'under the Constitution, laws, or treaties of the United States.' The claim on which the Constitutional issue is raised must be well-pleaded.").

The grounds for relief must be pleaded with "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.

Allegations of fraud must meet the heightened pleading standard of Federal Rule of Civil Procedure 9(b), which requires that the plaintiff "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b).  Under Rule 9(b), the complaint must:  (i) "specify the statements that the plaintiff contends were fraudulent," (ii) "identify the speaker," (iii) "state where and when the statements were made," and (iv) "explain why the statements were fraudulent." *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290 (2d Cir. 2006).  The Amended Complaint fails to plead the elements of fraud to any standard, let alone the heightened requirements of Rule 9(b).[12]

### A.      The Amended Complaint Fails to Plead Common Law Fraud.

To state a claim for common law fraud, the complaint must allege:  "[1] a misrepresentation or a material omission of fact which was false and known to be false by defendant, [2] made for the purpose of inducing the other party to rely upon it, [3] justifiable reliance of the other party on the misrepresentation or material omission, and [4] injury." *Premium Mortg. Corp. v. Equifax, Inc.*, 583 F.3d 103, 108 (2d Cir. 2009).

The Amended Complaint identifies no purported misstatement or omission of fact in the Pricing Supplement or otherwise.  It identifies no dates for any alleged misstatements or omissions.  It identifies no speakers of any purported misstatements or omissions.  It states no basis from which to determine that any allegedly fraudulent statement was known to be false at

---

[12]     The Court should disregard allegations contradicted by documents publicly filed with the SEC.  *See, e.g.*, *Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1092 (2d Cir. 1995); *see also In re Optionable Sec. Litig.*, 577 F. Supp. 2d 681, 692 (S.D.N.Y. 2008) ("If allegations of securities fraud conflict with the plain language of the publicly filed disclosure documents, the disclosure documents control, and the court need not accept the allegations as true.").

the time it was made.  It provides no allegations as to why or how Plaintiff relied upon any purported misstatement or omission to cause a loss.[13]

1.  The Amended Complaint Fails to
Plead a Material Misstatement or Omission.

The Amended Complaint alleges that Plaintiff executed all of his trading through an online (E-Trade) brokerage account.  Compl. ¶ 5; *see also id.* Ex. A (ECF No. 1-1 at 3). Accordingly, there is no alleged trading relationship with CGMHI or any purported misstatement made by a CGMHI representative.  Nor does the Amended Complaint identify any statement or omission in the Pricing Supplement, let alone one with the specificity required under Rule 9(b). Plaintiff's generalized allegations that the "Indicative Value" for the UWT Notes were "fraudulently tracking" or "grossly not tracking" the Index (*see, e.g.*, Compl. ¶¶ 2, 3, 5-9) are baseless and expressly foreclosed by the Pricing Supplement for three reasons:

First, in making allegations about "fraudulent tracking," Plaintiff conflates the Indicative Value with the alleged "trading prices" he observed in the secondary market.  Compl.¶¶ 5-7. But, as set forth in the Pricing Supplement, the Indicative Value for the UWT Notes is not the trading price at which investors can buy or sell ETNs in the secondary market:

> The Intraday Indicative Value is a calculated value and is not the same as the trading price of the ETNs and is not a price at which you can buy or sell the ETNs in the secondary market.  The Intraday Indicative Value does not take into account the factors that may influence the trading price of the ETNs, such as imbalances of supply and demand, lack of liquidity and credit

---

[13]     Although the Amended Complaint fails to advance a federal securities law claim (*see* § I.B, *supra*), any such claim would be equally deficient because the "elements of claims for federal securities fraud and New York common law fraud are nearly identical."  *See, e.g.*, *Axar Master Fund, Ltd. v. Bedford*, 806 F. App'x 35, 38 n.2 (2d Cir. 2020) (Summary Order) ("Because the elements of claims for federal securities fraud and New York common law fraud are nearly identical, we also affirm the district court's dismissal of plaintiffs' common law fraud claims after concluding that plaintiffs failed to state a claim for federal securities fraud.") (citing *Newman v. Family Mgmt. Corp.*, 530 F. App'x 21, 24 (2d Cir. 2013) (Summary Order)).

> considerations.  **The actual trading price of the ETNs in the secondary market may vary significantly from their Intraday Indicative Value**.

Rubin Decl., Ex. A at 9 (emphasis in original).  Instead, Indicative Value is calculated to approximate the value of the ETNs at one specific time each day to determine redemption values for the UWT Notes at maturity or acceleration.  *Id.*  It does not determine actual trading prices in the market, as the Pricing Supplement explains:

> The market value of the ETNs at any given time, which we refer to as the trading price, is the price at which you may be able to sell your ETNs in the secondary market at such time, if one exists.  In the absence of an active secondary market for the ETNs, the last reported trading price may not reflect the actual price at which you may be able to sell your ETNs at a particular time.  **The trading price of the ETNs in the secondary market is not the same as the Indicative Value of the ETNs at any time, even if a concurrent trading price in the secondary market were available at such time**.  The trading price of any series of the ETNs at any time may vary significantly from the Indicative Value of such ETNs at such time because the market value reflects investor supply and demand for the ETNs.

*Id.* at 18 (emphases added).  Accordingly, Plaintiff's pricing calculations (Compl. ¶¶ 5-7) and perceived divergence in market prices for UWT Notes are misguided because such trading prices are determined by the market, and there is nothing in the Amended Complaint that identifies a misrepresentation or omission about CGMHI's tracking of the UWT Notes' Indicative Value.

Second, CGMHI does not calculate or compute Indicative Value.  As set forth in the Pricing Supplement, a separate calculation agent that is not a party in this action is "responsible for computing and disseminating" Indicative Value (both on an intra-day and closing basis), which calculations are then subject to an affiliate of CGMHI's (which also is not a party to this action) right to dispute.  Rubin Decl., Ex. A at 56.

Third, Plaintiff's effort to manufacture a fraud claim based on the alleged performance of a separate ETN called the "3x Inverse Crude Oil ETNs," which traded under the ticker "DWT,"

is baseless.  Compl. ¶ 4.  As an initial matter, Plaintiff does not allege that he purchased DWT notes and lacks standing regarding claims concerning the performance of those notes.  *See In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 368 (S.D.N.Y. 2011) (dismissing plaintiffs' fraud claims and holding that a plaintiff "cannot claim a personal injury in connection with a security he did not purchase" and "lacks standing to sue on claims arising from . . . offerings which he did not purchase.").  In any event, as with the UWT Notes, the trading prices for the DWT notes in the secondary market were determined by market conditions (not Indicative Value) as set forth above.  *See* pg. 14-15, *supra*.  The Amended Complaint fails to identify any alleged misstatement or omission in the Pricing Supplement concerning the DWT notes.[14]

2.    The Amended Complaint Fails to Plead Scienter or Intent to Defraud.

To state a fraud claim, "plaintiffs must allege facts that give rise to a strong inference of fraudulent intent."  *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 52 (2d Cir. 1995).  To establish the requisite inference of fraudulent intent, a plaintiff must plead facts that:  (i) "demonstrate the defendant's motive and opportunity to commit or assist in the fraud" or (ii) "constitute strong circumstantial evidence of the defendant's conscious misbehavior or recklessness."  *Matsumura v. Benihana Nat'l Corp.*, 542 F. Supp. 2d 245, 255 (S.D.N.Y. 2008) (citing *In re Parmalat Secs. Litig.*, 501 F. Supp. 2d 560, 573 (S.D.N.Y. 2007)).

As courts in this District have observed dismissing other ETN litigations, the Amended Complaint's vague and conclusory allegations of scienter are insufficient.  *See, e.g.*, *Y-Gar Capital LLC v. Credit Suisse Grp. AG*, No. 19-cv-2827 (AT), 2020 WL 71163, at *8 (S.D.N.Y. Jan. 2, 2020) (rejecting scienter allegations regarding alleged market manipulation of ETNs); *Set*

---

[14]    The Amended Complaint also references "false advertising," but courts reject such claims in securities contexts.  *See, e.g.*, *M&T Bank Corp. v. LaSalle Bank Nat'l Ass'n*, 852 F. Supp. 2d 324, 341-42 (W.D.N.Y. 2012) (citing *Morris v. Gilbert*, 649 F. Supp. 1491, 1496 (E.D.N.Y 1986)) (rejecting false advertising claim in securities context)).

*Capital LLC v. Credit Suisse Grp.*, Nos. 18-cv-2268, 2319, 4045 (AT)(SN), 2019 WL 3940641, at *5-6 (S.D.N.Y. Aug. 16, 2019) (overruling objections to dismissal of scienter allegations regarding alleged market manipulation of ETNs).

The Amended Complaint's references to generalized profit motives (*see* Compl. ¶ 8) "could be imputed to any publicly-owned, for-profit endeavor" and are an insufficient basis for scienter as a matter of law. *Kalnit v. Eichler*, 264 F.3d 131, 140 (2d Cir. 2001); *see also Chill v. G.E. Co.*, 101 F.3d 263, 268 (2d Cir. 1996). Nor is fraudulent intent established by referencing regulatory fines unrelated to the investments at issue in the case (*see* Compl. ¶¶ 1, 10). *See In re Deutsche Bank Aktiengesellschaft Sec. Litig.*, No. 16 Civ. 3495 (AT) (BCM), 2007 WL 4049253, at *8 (S.D.N.Y. June 28, 2017) (plaintiff's "citation to a number of lawsuits and government investigations" alleged "no evidence of scienter"), *aff'd*, 729 F. App'x 55 (2d Cir. 2018).

Likewise, Plaintiff's conclusory speculation that "computer programs," and "algorithms" that calculate Indicative Value must have been subject to "intentional human interference" (Compl. ¶¶ 8-9)—and presumably by CGMHI—is unsupported by any factual allegation. As set forth above, the calculated Indicative Values which Plaintiff alleges were changed (*id.* ¶ 9) are distinct from the prices at which he voluntarily purchased and sold the UWT Notes in the secondary market. *See* pg. 14-15, *supra*. And, even if the Indicative Value were germane to the allegations here (which concern trading prices, not Indicative Value), Plaintiff's conclusory allegations are implausible because, as also set forth above, a third party (not CGMHI) was "responsible for computing and disseminating" Indicative Value, subject to a CGMHI affiliate's right to dispute that third party's calculations. *Id.*

3.      The Amended Complaint Fails to
        <u>Plead Reasonable Reliance on any Material Misstatement or Omission</u>.

Just as the Amended Complaint fails to plead a material misstatement or omission (*see* §

II.A.1, *supra*), it also fails to plead reasonable reliance on any such alleged misstatement or

omission.[15]  Rather, Plaintiff attempts to side-step the Pricing Supplement altogether alleging

that "few" investors "would have been expected to read all of the small print" in the Pricing

Supplement.  Compl. ¶ 8.

There is no basis to disregard the Pricing Supplement's disclosures, and, on the basis of

nearly identical disclosures, courts in this District have repeatedly rejected securities fraud

claims concerning ETNs.  In *In re TVIX Sec. Litig.*, 25 F. Supp. 3d 444 (S.D.N.Y. 2014), *aff'd*

*sub nom.*, 588 F. App'x 37 (2d Cir. 2015), Judge Swain dismissed (and the Second Circuit

affirmed dismissal of) federal securities fraud claims concerning ETNs' alleged

underperformance of their indicative targets following a precipitous drop in the trading price for

their underlying indices.  *Id.*  Relying on the disclosures in those ETNs' pricing supplements

regarding indicative value, and the risks of holding such notes beyond one-day holding periods,

the *TVIX* court dismissed plaintiffs' fraud claims because the pricing supplement "explicitly

warned" that the notes were "complex, volatile financial products designed for sophisticated

investors' use in daily hedging, and that significant losses would likely attend longer-term

holding strategies."  *Id.* at 451.

---

[15]     Courts in this District decline to apply the presumption of reliance available in federal
securities fraud contexts to common law fraud claims.  *See, e.g.*, *Ge Dandong v. Pinnacle
Performance Ltd.*, No. 10-cv-8086 (JMF), 2013 WL 5658790, at *9 (S.D.N.Y. Oct. 17, 2013)
("Defendants are certainly correct that reliance cannot be presumed here.  The fraud-on-the-
market presumption of reliance that applies in federal securities claims under Rule 10b–5 does
not apply to a common law fraud action.").

Other courts in this District have done the same.  *See, e.g.*, *Y-Gar Capital*, 2020 WL 71163, at *1 (dismissing federal claims alleging fraud and market manipulation in connection with a redemption of ETNs); *Rubinstein v. Credit Suisse Grp.*, 457 F. Supp. 3d 289, 301 (S.D.N.Y. 2020) (dismissing Section 11 claims regarding ETNs based on risk disclosures, including with regard to the market price of the notes); *Set Capital*, 2019 WL 3940641, at *2-3 (dismissing fraud claims concerning ETNs and noting disclosures regarding disparities between indicative value and market price), *rep. and rec. adopted*, 2019 WL 4673433 (S.D.N.Y 2019). Consistent with the holdings in these cases, the disclosures in the Pricing Supplement foreclose Plaintiff's fraud claim.  *See Olkey v. Hyperion 1999 Term Trust, Inc.*, 98 F.3d 2, 9 (2d Cir. 1996) (affirming dismissal of fraud claims contradicted by disclosures in the governing prospectus).

### 4.  The Amended Complaint Fails to Plead Loss Causation.

Courts recognize that the doctrine of loss causation applies to common law fraud claims such as Plaintiff's claim.  *Bank of Am., N.A. v. Bear Stearns Asset Mgmt.*, 969 F. Supp. 2d 339, 346 (S.D.N.Y. 2013)).  To allege loss causation, the plaintiff must allege facts which, if true, show that the purported fraudulent statement or omission "was the reason the transaction turned out to be a losing one."  *Id.* (citation omitted).  Plaintiff alleges that the UWT Notes—which are intended to be held for a one-day holding period or less (*see* pgs. 3-5, *supra*)—were trading at a "fair price" on March 17, 2020 before the start of any claimed fraud (Compl. ¶ 5) and that the only UWT Notes Plaintiff purchased thereafter (on March 19) were sold at an intra-day trading profit.  Compl. Ex. B (ECF No. 1-2).  Thus, any alleged fraud beginning after March 17 could not have caused a loss to Plaintiff.

Moreover, the Amended Complaint pleads that, at the onset of the Covid-19 pandemic (Compl. ¶ 9), Plaintiff was invested in a three-times leveraged-long ETN tied to the value of a

crude oil index, the decline of which is an intervening event[16], and the Amended Complaint pleads no facts that, if true, would establish that Plaintiff's losses were caused by alleged misstatements or omissions.  *See, e.g.*, *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 772 (2d Cir. 1994) (affirming dismissal of fraud claims for lack of loss causation because the plaintiff did "not adequately plead facts which, if proven, would show that its loss was caused by the alleged misstatements as opposed to intervening events") (citing *Bastian v. Petren Res. Corp.*, 892 F.2d 680, 685 (7th Cir. 1990) (affirming dismissal of fraud claims arising out of declines in oil and gas investment declines during a collapse in the 1980s and holding that "Rule 10b–5 does not make [defendants] insurers against national economic calamities")).

## CONCLUSION

CGMHI respectfully requests that the Court dismiss the Amended Complaint, in its entirety, and without leave to amend.[17]

---

[16]    The Court can take judicial notice of declines in the crude oil market in March 2020.  The Second Circuit has previously taken judicial notice of a "recent sharp decline in the price of oil." *See Metro. Trans. Auth. v. Fed. Energy Reg. Comm*., 796 F.2d 584, 593 (2d Cir. 1986)).  The S&P's website (https://www.spglobal.com/spdji/en/indices/commodities/sp-gsci-crude-oil/#overview), reports that the Index to which the UWT Notes were linked traded at a high of $256.22 on March 2, 2020 and a low of $110.11 on March 30, reflecting a $146.11 (or approximately 57%) decline from high to low in March 2020.

[17]    The Amended Complaint is Plaintiff's third complaint.  The original complaint (ECF No. 1) was amended once on December 3, 2020 (ECF No. 21) pursuant to this Court's Individual Practices (Rule 2(D)) and again on December 29, 2020 (ECF No. 22).  Moreover, in light of the jurisdictional and pleading deficiencies set forth herein, CGMHI respectfully submits any amendment would be futile and wasteful of the parties' and the Court's resources.

Dated:   January 20, 2021          Respectfully submitted,
         New York, New York

                                   **GOODWIN PROCTER LLP**

                                   /s/  Samuel J. Rubin

                                   Marshall H. Fishman
                                   Samuel J. Rubin

                                   The New York Times Building
                                   620 Eighth Avenue
                                   New York, New York 10018
                                   Phone:  (212) 813-8800
                                   Fax:  (212) 813-3333
                                   mfishman@goodwinlaw.com
                                   srubin@goodwinlaw.com

                                   *Attorneys for Defendant Citigroup Global Markets*
                                   *Holdings Inc.*