```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#: _____
DATE FILED:  9/29/23
```

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

**KIRK,**

                                        **Plaintiff,**

                    **-against-**

**CITIGROUP GLOBAL MARKET**
**HOLDINGS, INC.,**

                                        **Defendant.**

**20-cv-07619 (ALC)**

<u>**OPINION & ORDER**</u>

---

**ANDREW L. CARTER, JR., United States District Judge:**

Pending before the Court is Defendant's motion to dismiss the Plaintiff's third amended complaint ("TAC") pursuant to Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure. For the following reasons, Defendant's motion is **GRANTED.**

## BACKGROUND

### I.       Procedural Background

Plaintiff David Kirk, who is proceeding *pro se*, brings this action alleging violations of federal securities law and fraud under New York State law against Defendant Citigroup Global Market Holdings, Inc. ("CGMHI"). Plaintiff first filed this suit on September 17, 2020. ECF No. 1. Plaintiff filed his third, which he called his final amended complaint ("TAC") on December 29, 2020. ECF No. 22. Plaintiff explained that the TAC "is meant to be taken in addition to rest of [his] Complaint" at ECF No. 1. *Id*.

On April 16, 2021, the Court accepted several cases as related to this instant action and granted Defendant leave to file a motion to consolidate these cases. ECF No. 42. The Court then reconsidered its decision to grant Defendant leave to file a motion to consolidate and instead denied Defendant's motion. ECF No. 65. In that same order, the Court explained that it would consider the TAC, ECF No. 22, to be the operative complaint in this action and denied any request to further

amend the TAC. *Id*. The Court also denied Plaintiff's request seeking reconsideration of the Court's decision denying his application for pro bono counsel. *Id*.

On May 19, 2021, the Court also established a two-track briefing schedule in this action whereby the parties were directed to first brief the issue of subject matter jurisdiction. *See* ECF Nos. 65, 80. On June 9, 2021, CGMHI moved to dismiss Plaintiff's third amended complaint under Federal Rule of Civil Procedure 12(b)(1) arguing the Court lacked subject matter jurisdiction.[1] *See* ECF No. 78. On January 13, 2022, this Court held that it lacked federal diversity jurisdiction and granted Defendant's motion. ECF No. 96. Plaintiff then appealed the Court's order. *See* Notice of Appeal, ECF No. 99. On October 18, 2022, the Court of Appeals for the Second Circuit issued a summary order vacating the Court's dismissal order and remanding for further proceedings. *See Kirk v. Citigroup Global Markets Holdings Inc.*, No. 22-179, 2022 WL 10218518, at *1 (2d Cir. Oct. 18, 2022), ECF No 100. Applying the "requisite liberal construction afforded to *pro se* litigants," the Second Circuit held that Plaintiff's amended complaint sufficiently invoked the federal securities law in order to confer federal question subject matter jurisdiction in this Court. *Id*. The Second Circuit explained that Plaintiff's allegations "could [] implicate" Sections 11 and 12 of the Securities Act and Section 10(b) of the Exchange Act. *Id*. at *2.

Following the Second Circuit's summary order, Plaintiff filed a motion requesting my recusal on November 21, 2022. ECF No. 104. On January 12, 2023, the Court denied this motion and ordered the parties to file a joint status report with a proposed briefing schedule for Defendant's motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6). ECF No. 110. On January 12, 2023, Plaintiff filed a letter renewing his request for the appointment of *pro bono* counsel

---

[1] Pursuant to the two-track briefing protocol, a Rule 12(b)(6) motion was to be separately briefed only upon first establishing the Court's federal subject matter jurisdiction.

representation. ECF No. 111. On January 31, 2023, Defendant filed the instant motion to dismiss, ECF No. 114, and supporting memorandum of law. "MTD," ECF No 115. On February 10, 2023, Plaintiff filed his opposition ("Opp."). ECF No. 117. Defendant filed its reply ("Reply") on February 28, 2023. ECF No. 118. The motion is deemed fully briefed.

## II.    Factual Background

The facts summarized herein are taken from Plaintiff's third amended complaint, ECF No. 22, as well as exhibits that Plaintiff has attached to the original complaint. *See* ECF Nos. 1-1, 1-2, 1-3.[2] Plaintiff David Kirk is a broker and Florida resident. Defendant CGMHI is headquartered in New York. Plaintiff alleges that Defendant was the issuer of the "two now liquidated and defunct stocks" known as the "Velocity Shares 3x Long Crude Oil ETNs" (the "UWT ETNs") and the Velocity Shares 3x Inverse Crude Oil ETNs (the "DWT ETNs").[3] TAC ¶ 3. Plaintiff purchased the UWT ETNs in the secondary market. TAC ¶ 5; ECF Nos. 1-1, 1-2.[4]

---

[2] Although the Court generally should not look outside of the pleadings to decide a motion to dismiss a complaint, the Court may consider "any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit" of which a court may take judicial notice. *Sgalambo v. McKenzie*, 739 F.Supp.2d 453, 470 (S.D.N.Y. 2010) (quoting *ATSI Commc'ns Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007)). Plaintiff references the Pricing Supplement filed by Defendant in his complaint; therefore, it is incorporated into the complaint by reference. *See* ECF No. 1-3 at 2; TAC ¶¶ 7, 8 (citing and quoting the "prospectus").

[3] Plaintiff's complaint does not specifically allege that he purchased any DWT notes. *See generally* TAC; ECF Nos. 1-1, 1-2 (brokerage statement only demonstrating purchases of UWT ETNs).

[4] CGMHI issued the UWT ETNs, which were traded thereafter on the New York Stock Exchange, in the second market. *See* TAC ¶¶ 2, 5, 8; ECF Nos. 1-1, 1-2 (Plaintiff alleges that he purchased his UWT ETNs through an E-Trade online brokerage account). In his opposition, Plaintiff argues he did not trade in the secondary market because he did not engage in any "extended hours" trading. Opp. ¶ 3. However, secondary market trading means "trading in existing or outstanding securities on exchanges and over the counter markets", such as the New York Stock Exchange. *See, e.g.*, *United States v. Hanna*, 198 F. Supp. 2d 236, 241 (E.D.N.Y. 2002); *see also In re Tronox, Inc. Sec. Litig.*, No. 09 Civ. 6220 (SAS), 2010 WL 2835545, at *11 (S.D.N.Y. June 28, 2010). In his initial complaint, Plaintiff alleges he traded on the New York Stock Exchange. *See* ECF No 1 at 5.

Plaintiff alleges that, as of March 17, 2020, he was holding 37,500 UWT ETNs that were trading at a "fair price" in the secondary market. TAC ¶ 5; ECF Nos. 1-1, 1-2. On March 19, 2020, he purchased an additional 12,500 UWT ETNs, increasing his total number to 50,000 UWT ETNs. ECF Nos. 1-1 at 3, 1-2 at 22.

The UWT ETNs were linked to the S&P GSCI Oil Index ER (the "Index"), which tracks futures contracts for crude oil. TAC ¶ 4; *see also* Decl. of Samuel J. Rubin, Ex. A, (the "Pricing Supplement"), ECF Nos. 116-1 to 116-6.[5] The UWT ETNs were unsecured debt obligations that were intended to be daily trading tools for sophisticated investors. Pricing Supplement at 1-2.[6] They reflected a leveraged long or leveraged inverse exposure to the performance of the Index on a daily basis. *See Id.* at 3. Unlike debt securities that provide interest and a guaranteed return of principal, the ETNs offered investors the right "to receive a cash payment at maturity, upon early redemption or upon acceleration, as applicable, ... linked to the performance of the Index." *Id.*

Defendant published the Pricing Supplement, dated March 18, 2020, in which it discloses the risks of investing in the UWT ETNs. The Pricing Supplement explains that:

> The ETNs are riskier than securities that have intermediate or long-term investment objectives, and may not be suitable for investors who plan to hold them for a period other than one day. Any decision to hold the ETNs for more than one day should be made with great care and only as the result of a series of daily (or more frequent) investment decisions to remain invested in the ETNs for the next one-day period. Accordingly, the ETNs should be purchased only by knowledgeable investors who understand the potential consequences of an investment linked to the Index and of seeking daily compounding leveraged long ... investment results....

---

[5] The full title of the Pricing Supplement is "Pricing Supplement No. 2016 – USNCH0277/A/10± and 2016 – USNCH0278/A/10± Dated March 18, 2020 (to Prospectus Supplement and Prospectus each Dated May 14, 2018): Medium-Term Senior Notes, Series N. *See* ECF No. 116.

[6] All page citations to the Pricing Supplement correspond to the pagination at the bottom of the exhibit attached to the Declaration of Samuel J. Rubin.

*Id.* at 1. The Pricing Supplement warned that "the ETNs are highly speculative and highly risky and are suitable only for sophisticated investors who understand and can bear the risks associated with 3 times magnified losses resulting from adverse movements in the daily performance of the Index." *Id*. at 29. The Pricing Supplement also disclosed risk factors related to the volatility of crude oil markets that could impact the trading prices and redemption values of the UWT ETNs. For example, the Pricing Supplement explained that the UWT ETNs "could experience greater volatility" than other investments because the Index tracks a single commodity – crude oil. *Id.* at 46, 47; MTD at 6. Furthermore, the Pricing Supplement explained that the trading price of the UWT ETNs is determined based on trading in the secondary market, not based on the so-called "indicative value" of the ETNs. Pricing Supplement at 16; MTD at 4-5; *see generally Steadman v. Citigroup Glob. Markets Holdings Inc.*, 592 F. Supp. 3d 230, 235, 247 (S.D.N.Y. 2022) (explaining the summary terms of the UWT ETNs and the "indicative value"); *Thomas v. Citigroup Glob. Markets Holdings Inc.*, No. 21cv3673 (VEC) (DF), 2022 WL 1051158, at *3-*5, *15 (S.D.N.Y. Mar. 1, 2022), *report and recommendation adopted as modified*, No. 21-CV-3673 (VEC), 2022 WL 951112 (S.D.N.Y. Mar. 30, 2022).

The Pricing Supplement also explains that CGMHI has the right to accelerate the ETNs at its "option at any time," and that the ETNs will be automatically accelerated if the Index declines to a certain level. Pricing Supplement at 36, 62. Upon optional acceleration, investors are entitled to "receive a cash payment per ETN in an amount ... equal to the Closing Indicative Value of such series of ETNs on the final Valuation Date of the Optional Acceleration Valuation Period." *Id.* at 61. The Pricing Supplement explains that "the return on the ETNs will not be based entirely on Index

fluctuations during this period" and that investors would "not entirely benefit from any favorable movements in the level of the Index during this period as the Index Exposure declines." *Id.* at 36.

Plaintiff alleges that the UWT ETNs and the DWT ETNs fell over 50% in two days—March 17 to March 19. *Id.*¶¶ 4, 5. Plaintiff goes on to allege that because the stocks were "clearly not following each other as inverse stocks following the stated index or any index," this drop in price was "false advertising by defendant." *Id*. ¶ 4. Plaintiff alleges that he "had very little time to wait for UWT to rebound at a time when oil was at an extreme low" and that because he did not want to "risk more fraudulent drops," he had to sell on March 19, 2020. *Id*. ¶ 5. On that same day, Plaintiff liquidated his entire position in the secondary market for $14,607.45, which he claims reflects a loss of $17,438 when compared to an alleged "fair price" he would have received had he not held his position beyond March 17, 2020. TAC ¶¶ 3, 5-7. Plaintiff alleges that an "acute" and "blatant" fraud occurred because, on March 19, 2020 the Index increased by 24.39% and therefore the UWT ETNs should have increased by 73.17% (3x the Index increase), but they only increased by 23%. *Id*. ¶¶ 6,7.

Plaintiff explains in his third amended complaint that "few would have been expected to read all of the small print in such 85-page prospectus." *Id*.  ¶ 8. Plaintiff also alleges that to keep the trading prices in line with values approximating 3x the Index, the Defendant "used a simple computer program . . . to ensure that if the price of [the ETNs] deviated from the price it should have been to follow the index, the computer would automatically buy or sell enough stock to bring the price to where it should be so that the index was followed correctly." *Id*.  ¶ 9. Plaintiff concludes that because "computer programs don't change on their own[,] a human that had access to defendant's software must have chosen to change it . . . and this change was made on March 18 [and

March] 19, 2020" when the UWT ETNs "grossly mis tracked the index it was advertised to track." *Id*. Plaintiff seeks $43,300 in compensatory damages for his total UWT ETN position plus $393,300 in punitive damages. *Id.* ¶¶ 5, 10.[7]

## LEGAL STANDARD

When deciding a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court must "accept as true all factual statements alleged in the complaint and draw all reasonable inferences in favor of the non-moving party." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007). However, the Court need not credit "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Claims should be dismissed when a plaintiff has not pleaded enough facts that "plausibly give rise to an entitlement for relief." *Id.* at 679. A claim is plausible "when the plaintiff pleads factual content that allows the Court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (citing *Twombly*, 550 U.S. at 556). While not akin to a "probability requirement," the plaintiff must allege sufficient facts to show "more than a sheer possibility that a defendant has acted unlawfully." *Id.* (citing *Twombly*, 550 U.S. at 556). Accordingly, where a plaintiff alleges facts that are "'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557). The Court's function on a motion to dismiss is "not to weigh the evidence that might be presented at a trial but merely to determine

---

[7] Defendant argues that this damage calculation itself is incorrect because it includes the 12,500 UWT ETNs which Plaintiff "purchased on March 19, 2020 and sold the same day as a profit." MTD at 7 n.5. Defendant argues this would reduce the alleged trading losses to approximately $13,000.

whether the complaint itself is legally sufficient." *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985).

Further, in actions alleging securities fraud claims., the complaint is subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) and the PSLRA. Rule 9(b) requires that the complaint "state with particularity the circumstances constituting fraud or mistake." To satisfy the particularity requirement, a complaint must "(1) detail the statements (or omissions) that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements (or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent." *Fin. Guar. Ins. Co. v. Putnam Advisory Co*., LLC, 783 F.3d 395, 403 (2d Cir. 2015). The PSLRA "requires that any securities fraud complaint alleging misleading statements or omission of material fact must 'specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.'" *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004) (quoting 15 U.S.C. § 78u-4(b)(1)).

As to Plaintiff's *pro se* status, it is "well established that the submissions of a *pro se* litigant must be construed liberally and interpreted to raise the strongest arguments that they suggest." *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (internal quotation marks and citation omitted); *see Hughes v. Rowe*, 449 U.S. 5, 9 (1980) (holding that a *pro se* party's pleadings must be liberally construed in his favor and are held to a less stringent standard than the pleadings drafted by lawyers). "*Pro se* litigants must nonetheless abide by the same rules that apply to all other

litigants." *Farmer v. United States*, No. 15-cv-6287, 2017 WL 3448014, at *2 (S.D.N.Y. Aug. 10, 2017) (citations and quotation marks omitted).

## DISCUSSION

Applying the requisite liberal construction afforded to *pro se* litigants, the Court construes Plaintiff's third amended complaint to assert claims under Sections 11 and 12(a)(2) of the Securities Act and Section 10(b) of the Exchange Act, and common law fraud under New York state law.

### I.      Sections 11 and 12(a)(2) of the Securities Act

Section 11 of the Securities Act of 1933 provides a private right of action to investors of a security if "any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact." 15 U.S.C. § 77k(a). To state a claim under Section 11 of the Securities Act, Plaintiff "must allege that: (1) [it] purchased a registered security, either directly from the issuer or in the aftermarket following the offering; (2) the defendant participated in the offering in a manner sufficient to give rise to liability under section 11; and (3) the registration statement contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." *Steadman v. Citigroup Glob. Markets Holdings Inc.*, 592 F. Supp. 3d 230, 238 (S.D.N.Y. 2022) (citing *Y-GAR Cap. LLC v. Credit Suisse Grp. AG*, No. 19 CIV. 2827 (AT), 2020 WL 71163, at *3 (S.D.N.Y. Jan. 2, 2020)). Under Section 11, "a misrepresentation of fact is material if 'an investor would attach importance to it in making an investment decision.'" *Ho v. Duoyuan Glob. Water, Inc.*, 887 F. Supp. 2d 547, 562 (S.D.N.Y. 2012) (quoting *In re APAC Teleservice, Inc. Sec. Litig.*, 1999 WL 1052004, at *9 (S.D.N.Y. Nov. 19, 1999)).

Section 12(a)(2) "provides that a person who sells securities by means of a prospectus that misrepresents or omits material facts is liable to the person purchasing such security from him." *Rombach*, 355 F.3d at 168, n.3 (citing 15 U.S.C. § 77*l* (a)(2)). "To prevail on a claim under section 12(a)(2), the plaintiffs must show that the defendant[] offered or sold a security by means of a prospectus or oral communication that included a material misrepresentation or omission." *Hutchison v. CBRE Realty Fin., Inc.*, 638 F. Supp. 2d 265, 271 (D. Conn. 2009), *aff'd on other grounds sub nom. Hutchison v. Deutsche Bank Sec. Inc.*, 647 F.3d 479 (2d Cir. 2011).

These statutes are "siblings with roughly parallel elements" and do not require allegations of "scienter, reliance, or loss causation." *N.J. Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC*, 709 F.3d 109, 120 (2d Cir. 2013). "The same standard applies to claims brought under Section 12(a)(2) as to claims brought under Section 11, the difference being that Section 11 pertains to material misstatements and omissions made in a registration statement while section 12(a)(2) pertains to material misstatements and omissions made in a prospectus." *Hutchison*, 638 F. Supp. 2d at 271.

Defendant argues that Plaintiff's Securities Act claims should be dismissed because the third amended complaint  (a) fails to allege an untrue statement of material fact or (b) trace Plaintiff's purchase to a registration statement, as required by Section 11, or to allege a direct purchase pursuant to a misleading prospectus, as required by Section 12(a)(2). MTD at 15. The Court finds that the third amended complaint fails to state a claim under both Sections 11 and 12 of the Securities Act of 1933.

**A. The TAC Fails to State Any Misleading or False Statement Made by or on Behalf of CHMHI**

The Plaintiff alleges that he suffered damages "as a result of Defendant's blatant fraud in its stock UWT grossly not tracking the [I]ndex it was advertised to track." TAC ¶ 3. Additionally, in his opposition, Plaintiff argues that "the stock description" is a "misstatement" because it "guarantee[s]" the trading price of the UWT ETNs to track the "specified [I]ndex." Opp. ¶¶ 2, 5, 14. Plaintiff asserts that the Defendant's alleged advertisement in the description of the UWT ETNs in the Pricing Supplement was false because the trading prices for the UWT ETNs did not track the Index on March 19, 2020. However, there "cannot be a material misstatement or omission if defendants' statements explicitly disclosed the very risks about which plaintiff claims to have been misled." *Steadman*, 592 F. Supp. 3d at 237 (citing *Y-GAR Cap. LLC*, 2020 WL 71163, at *4); *see also Allen v. Citigroup Glob. Mkt. Holdings, Inc.*, No. 21-CV-2387 (ALC), 2023 WL 2368833, at *4 (S.D.N.Y. Mar. 6, 2023).

As several courts have found, including this one, the Pricing Supplement warns investors of the particular and heightened risks associated with investing in the ETNs.[8] *See Steadman*, 592 F. Supp. 3d at 237; *Allen*, 2023 WL 2368833, at *4; *Thomas*, 2022 WL 1051158, at *14. The Pricing Supplement expressly warns that trading prices for the UWT ETNs and DWT ETNs were

---

[8] As explained above, Plaintiff's complaint makes no mention that he directly purchased any DWT ETN notes. *See generally* TAC; ECF Nos. 1-1, 1-2 (brokerage statement only demonstrating purchases of UWT ETNs). Defendant argues that, therefore, Plaintiff lacks standing regarding any claims concerning the performance of these notes. *See* Reply at 4 n.4 (citing *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 368 (S.D.N.Y. 2011)). However, the Plaintiff alleges that "both stocks [UWT and DWT] dropped over 50% in the same two-day period" and that "defendant stole over half of all investor's money in BOTH stocks." TAC ¶ 4. Because the *pro se* litigant's submission must be construed liberally and interpreted to raise the strongest arguments that they suggest, the Court declines to find that Plaintiff lacks standing as to the DWT ETNs. In any event, any claim related to the DWT ETNs is dismissed for failure to state a claim as explained in this section discussing the impact of Defendant's disclosures in the Pricing Supplement, which applies to both UWT ETNs and the DWT ETNs.

determined by the market—not CGMHI—and could "vary significantly" from the Indicative Value

for the ETNs based on the Index. Pricing Supplement at 18 ("The trading price of the ETNs in the

secondary market is not the same as the Indicative Value of the ETNs at any time, even if a

concurrent trading price in the secondary market were available at such time. The trading price of

any series of the ETNs at any time may vary significantly from the Indicative Value of such ETN s

at such time because the market value reflects investor supply and demand for the ETNs"); *id.*, at

16 ("The trading price of the ETNs is a market-determined price that will reflect market supply and

demand and may differ from the most recent Indicative Value."). The Pricing Supplement further

states that the trading prices for the UWT ETNs could be influenced "by many unpredictable

factors" beyond CGMHI's control like global supply and demand for crude oil and economic events

affecting the commodities markets. *Id.* at 38. "Nowhere did CGMHI represent that it had control

over the ETNs' secondary market trading prices, nor did it represent that the value of the ETNs

would faithfully track three times the Index on a daily basis for the duration of an ETN holder's

investment." *Thomas*, 2022 WL 1051158, at *15; *Steadman*, 592 F. Supp. 3d at 247 ("CGMHI had

no control over the trading price of the ETNs in the secondary market, nor does it make any such

representation").

   "The Pricing Supplement thus forecloses the notion that the "3x" included in the ETNs'

name is a representation that the ETN on a daily basis will rise or fall three times the extent to which

the Index rises or falls[—r]ather the daily value of the ETN is determined in the market." *Steadman*,

592 F. Supp. 3d at 247; *see* also Pricing Supplement at 18; *Thomas*, 2022 WL 1051158, at *15.

Although Plaintiff alleges that "few would have been expected to read all of the small print in such

85-page prospectus", TAC ¶ 8, Plaintiff cannot ignore or overlook the disclosures made in the

Pricing Supplement. Because the third amended complaint has failed to plead a material misstatement or omission, Plaintiff has failed to state a claim under Section 11 or Section 12(a)(2).

## II.      Section 10(b) of the Exchange Act

Section 10(b) of the Securities Exchange Act of 1934 prohibits using or employing, "in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance." 15 U.S.C. § 78j(b). To state a claim for fraud under Section 10(b), "'a plaintiff must plead that the defendant made a false statement or omitted a material fact, with scienter, and that plaintiff's reliance on defendant's action caused plaintiff injury.'" *Cartwright v. D'Alleva*, 782 F. App'x 77, 78 (2d Cir. 2019) (summary order) (quoting *Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir. 2001). Additionally, a plaintiff must allege fraud with particularity pursuant to Federal Rule of Civil Procedure 9(b) and the PSLRA. *Id.*

As explained previously, the TAC fails to identify a fraudulent statement. Therefore, the Court dismisses Plaintiff's Section 10(b) claim for failure to state a claim. The Court will not address Defendant's remaining arguments related to the Section 10(b) claim.

## III.     Common Law Fraud Claim

The Court construes Plaintiff's third amended complaint to also bring a claim for common law fraud under New York state law. Defendant argues that the complaint has failed to state a claim for fraud under New York state law and that there is no basis for an exercise of diversity jurisdiction over this common law fraud claim. *See* MTD at 19–21. The Plaintiff has asserted both federal question jurisdiction, *see* TAC ¶ 1, and diversity jurisdiction. *See* TAC ¶ 2 ("This complaint meets the $75,000 threshold.").

Originally, this Court found there was no basis for an exercise of diversity jurisdiction over Plaintiff's common law fraud claim. ECF No. 96 at 2–3. As explained previously, the Second Circuit vacated this Court's order dismissing Plaintiff's complaint, finding that the Plaintiff had pleaded a violation of federal securities law sufficient to confer federal question jurisdiction. *See Kirk*, 2022 WL 10218518, at *1, ECF No 100. However, the Second Circuit did not opine on whether the district court had diversity jurisdiction over Plaintiff's state law claim. Defendant argues the Court should once again hold that it lacks diversity jurisdiction over Plaintiff's claim.

Although the instant motion is brought pursuant to Rule 12(b)(6) for failure to state a claim and not under Rule 12(b)(1) for lack of subject matter jurisdiction, "federal courts have an independent obligation to ensure that they do not exceed the scope of their jurisdiction." *Henderson ex rel. Henderson v. Shinseki*, 562 U.S. 428, 434 (2011). Federal diversity jurisdiction exists where plaintiffs and defendants are citizens of different states, and the amount-in-controversy is greater than $75,000. *See* 28 U.S.C. §1332(a). Here, there is no dispute that the parties are citizens of different states.

When a plaintiff seeks declaratory relief, "it is well established that the amount in controversy is measured by the value of the object of the litigation." *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 347 (1977) (citations omitted). The party invoking subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists. *Liranzo v. United States*, 690 F.3d 78, 84 (2d Cir. 2012) (quoting *Aurecchione v. Schoolman Transp. Sys., Inc.*, 426 F.3d 635, 638 (2d Cir.2005)). The amount in controversy is measured "as of the date of the complaint." *Scherer v. Equitable Life Assurance Soc'y of U.S.*, 347 F.3d 394, 397 (2d Cir. 2003).

14

As mentioned above, Plaintiff seeks $43,300 in compensatory damages—well below the $75,000 and one penny threshold to meet the amount-in-controversy requirement. TAC ¶¶ 5, 10. Plaintiff, however, also seeks $393,300 in punitive damages. *Id.* Plaintiff alleges the "complaint meets the $75,000 threshold for filing" in federal court because "punitive damages can be used to meet the $75,000 threshold when compensatory damages alone are under $75,000." *Id.* ¶ 2. Plaintiff arrives at this figure by multiplying his compensatory damages and the court's filing fee by nine. *Id.* ¶ 10. Plaintiff believes a multiple of nine would provide appropriate punishment for the Defendant's conduct. He cites, among other things, Defendant "never responding" to Plaintiff's letter indicating he wished to "settle" this dispute "amicably," the closure of the Defendant's office due to the Covid-19 pandemic, and then-Governor Cuomo's Executive Order 202 declaring a state of emergency at the beginning of the pandemic "as further justification" for punitive damages. *Id.*

The Second Circuit has explained that "if punitive damages are permitted under the controlling law, the demand for such damages may be included in determining whether the jurisdictional amount is satisfied." *A.F.A. Tours, Inc. v. Whitchurch*, 937 F.2d 82, 87 (2d Cir. 1991). "However, claims for punitive damages are reviewed with greater scrutiny than claims for actual damages when punitive damages serve to satisfy the jurisdictional requirement." *Z-Axis Tech Sols., Inc. v. Richmond Cap. Grp.*, LLC, No. 17 CIV. 3983 (GBD), 2018 WL 1088008, at *3 (S.D.N.Y. Feb. 14, 2018) (citations and internal quotation marks omitted). In fact, "[a] trial court is plainly not compelled to accept a claim of punitive damages . . . made for the purpose of conferring federal jurisdiction." *Pyskaty v. Wide World of Cars, LLC*, 856 F.3d 216, 225 (2d Cir. 2017) (citation omitted); *Zahn v. Int'l Paper Co.*, 469 F.2d 1033, 1033 n.1 (2d Cir. 1972), *aff'd*, 414 U.S. 291 (1973)

("In computing [the] jurisdictional amount, a claim for punitive damages is to be given closer scrutiny, and the trial judge accorded greater discretion, than a claim for actual damages.")

As previously explained by this Court, plaintiffs seeking punitive damages for common law fraud claims must "allege fraud that is founded upon such moral indifference as to be 'aggravated by evil' or to be demonstrative of a criminal indifference to civil obligations." *Koch v. Greenberg*, 14 F. Supp. 3d 247, 273 (S.D.N.Y. 2014), *aff'd*, 626 F. App'x 335 (2d Cir. 2015) (quoting *Rush v. Oppenheimer & Co., Inc.*, 596 F. Supp. 1529, 1532 (S.D.N.Y.1984)). "Punitive damages may only be recovered in a fraud action where the fraud is aimed at the public generally, is gross, and involves high moral culpability." *Z-Axis Tech Sols., Inc.*, 2018 WL 1088008, at *3 (quoting *Kelly v. Defoe Corp.*, 636 N.Y.S.2d 123, 124 (App. Div. 2d Dep't 1996)). Moreover, "'the conduct for which courts generally award punitive damages is that which is 'close to criminality,' being variously described as 'utter recklessness,' 'reckless and of a criminal nature,' 'wanton or malicious,' and 'gross and outrageous.'" *Id*. (quoting *Dubai Bank, Ltd., New York Branch v. Joshi*, No. 85 Civ. 5005(MJL), 1989 WL 168088, at *4 (S.D.N.Y. Aug. 29, 1989). However, punitive damages are "'refused in the 'ordinary' fraud and deceit case'" under New York law. *Kruglov v. Copart of Connecticut, Inc.*, 771 F. App'x 117, 120 (2d Cir. 2019) (summary order) (quoting *Walker v. Sheldon*, 10 N.Y.2d 401, 405 (1961)).

None of Plaintiff's contentions regarding Defendant's actions amount to either "moral indifference" or "criminal indifference to civil obligations." *Koch*, 14. F. Supp. 3d at 273. For example, the TAC's allegation that Defendant did not respond to a letter sent from Plaintiff detailing his allegations of fraud "within 5 business days" does not demonstrate "moral indifference" or "criminal indifference to civil obligations." *Id*. Similarly, it is unclear how then-Governor Cuomo's

Executive Order declaring a state of emergency could even be connected to Defendant's conduct here. Additionally, Plaintiff appears to allege that Defendant's purported fraud was "aimed at the public." *See* TAC ¶¶ 2, 10. Plaintiff's argument here seems to be connected to his allegations that Defendant's fraud affected "many stockholders," and Defendant closed its "main office" thereby creating a "blatant barrier to [its] victims." *Id*. "In articulating the public aim requirement, New York courts have invoked a distinction between a 'gross and wanton fraud upon the public' on the one hand and 'an isolated transaction incident to an otherwise legitimate business' on the other." *Z-Axis Tech Sols., Inc.*, 2018 WL 1088008, at *4 (quoting *Ball v. Cook*, No. 11-cv-5926 (RJS), 2012 WL 4841735, at *12 (S.D.N.Y. Oct. 9, 2012). Here, Plaintiff's allegations make "no indication that [Defendant] is running an illegitimate business" nor do his allegations demonstrate that Defendant's conduct was "gross" or involving  "high moral culpability." *Z-Axis Tech Sols., Inc.*, 2018 WL 1088008, at *3-*4. Given this, Plaintiff's claims amount to "ordinary" fraud and are insufficient to support punitive damages. Therefore, Plaintiff fails to meet the amount-in-controversy requirement of Section 1332(a), and the Court finds that it does not have subject matter jurisdiction over Plaintiff's state claim.[9]

In the alternative, even if the Court were to find it does have subject matter jurisdiction here, the Court would find Plaintiff has failed to state a common law fraud claim. The elements of fraud under New York law are: "[1] a misrepresentation or a material omission of fact which was false

---

[9] Under 28 U.S.C. § 1367, "in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367 (a). However, a district court "may decline to exercise supplemental jurisdiction" once the court "has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). Because neither party has asked this Court to exercise supplemental jurisdiction over Plaintiff's state claim, the Court will decline to do so. Because Plaintiff is granted leave to amend, he may further address the issue of jurisdiction in his amended complaint.

and known to be false by defendant, [2] made for the purpose of inducing the other party to rely upon it, [3] justifiable reliance of the other party on the misrepresentation or material omission, and [4] injury." *Premium Mortg. Corp. v. Equifax, Inc.*, 583 F.3d 103, 108 (2d Cir. 2009) (quoting *Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 413, 421 (N.Y.1996)). Additionally, in a "federal diversity action, such a claim must be pleaded with particularity." *Id.* (citing Fed. R. Civ. P. 9(b)).

The Second Circuit has noted that "the elements of claims for federal securities fraud and New York common law fraud are nearly identical." *Newman v. Fam. Mgmt. Corp.*, 530 F. App'x 21, 24 (2d Cir. 2013) (summary order). As explained above, Plaintiff has failed to plead that Defendant made a false or fraudulent statement, and therefore his claim for common law fraud under New York state law must also fail. *See Anschutz Corp. v. Merrill Lynch & Co.*, 690 F.3d 98, 110 (2d Cir. 2012) ("For the same reasons, we affirm the District Court's dismissal of [plaintiff's] common law fraud claim, which suffers from the same deficiencies as its claims under § 10(b).").

### IV.    Pro Bono Counsel

On January 12, 2023, Plaintiff filed a letter renewing his request for the appointment of pro bono counsel representation. ECF No. 111. The Court has twice denied Plaintiff's application for *pro bono* counsel. See ECF Nos. 42, 65. The *in forma pauperis* statute provides that the courts "may request an attorney to represent any person unable to afford counsel." 28 U.S.C. § 1915(e)(1). Unlike in criminal cases, in civil cases, there is no requirement that courts supply indigent litigants with counsel. *Hodge v. Police Officers*, 802 F.2d 58, 60 (2d Cir. 1986). Instead, the courts have "broad discretion" when deciding whether to seek *pro bono* representation for a civil litigant. *Id.* Even if a court does believe that a litigant should have a free lawyer, under the in forma pauperis statute, a court has no authority to "appoint" counsel, but instead, may only "request" that an attorney

volunteer to represent a litigant. *Mallard v. U.S. Dist. Court for the S. Dist. of Iowa*, 490 U.S. 296, 301-10 (1989). Courts must therefore request the services of *pro bono* counsel sparingly, and with reference to public benefit, in order to preserve the "precious commodity" of volunteer-lawyer time for those litigants whose causes are truly deserving. *Cooper v. A. Sargenti Co., Inc.*, 877 F.2d 170, 172-73 (2d Cir. 1989).

In *Hodge*, the Second Circuit Court of Appeals set forth the factors a court should consider in deciding whether to grant a litigant's request for pro bono counsel. 802 F.2d at 61–62. "Of course, the litigant must first demonstrate that he or she is indigent, for example, by successfully applying for leave to proceed in forma pauperis." *Gomez-Kadawid v. Dr. Lee*, No. 20CV01786 (VEC) (DF), 2021 WL 2269539, at *2 (S.D.N.Y. June 3, 2021). The court must then consider whether the litigant's claim "seems likely to be of substance" — "a requirement that must be taken seriously." *Hodge*, 802 F.2d at 60–61. In his original application for *pro bono* counsel, Plaintiff explains he had been repeatedly rejected to be represented by counsel "because of the nature of the case, not due to the inability to pay" and that he "does not now claim he is unable to pay." ECF No. 34-1.

Additionally, in his renewed request, Plaintiff argues that the Second Circuit's summary order "affirmed the . . . merits of this case" and thereby justifying access to a *pro bono* attorney. ECF No. 111 at 1.  However, this is incorrect. In its summary order, the Second Circuit held only that with the requisite liberal construction afforded to *pro se* litigants, Plaintiff's complaint invoked federal securities laws sufficient to confer federal question subject matter jurisdiction in this Court. *Kirk*, 2022 WL 10218518, at *1. In fact, the Second Circuit panel specifically explained it "need not reach Kirk's remaining arguments" and that "the issue of federal question jurisdiction . . . does not turn on whether Kirk stated a claim upon which relief can be granted." *Id*. at *2. And as explained

above, the Court does not find Plaintiff's claim meritorious. In any event, "in the absence of indigence, an inability to persuade counsel to take one's case on a contingency basis is not grounds for pro bono appointment of counsel." *Sardarian v. Fed. Emergency Mgmt. Agency*, No. 3:19-CV-910 (CSH), 2019 WL 8331443, at *4 (D. Conn. June 19, 2019). The Court once again denies Plaintiff's renewed request for *pro bono* counsel.

## V.    Leave to Amend

Leave to amend should be granted "when justice so requires." Fed. R. Civ. P. 15(a)(2). The "usual practice" in this Circuit upon granting a motion to dismiss is to permit amendment of the complaint. *Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd*., 33 F. Supp. 3d 401, 446–47 (S.D.N.Y. 2014) (citing *Ronzani v. Sanofi S.A.*, 899 F.2d 195, 198 (2d Cir. 1990)). Generally, "[a] pro se complaint 'should not [be] dismiss[ed] without [the Court] granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Chavis v. Chappius*, 618 F.3d 162, 170 (2d Cir. 2010) (citing *Branum v. Clark*, 927 F.2d 698, 705 (2d Cir. 1991)). However, the Second Circuit has also recognized that "[w]here a proposed amendment would be futile, leave to amend need not be given." *Hill v. Curcione*, 657 F.3d 116, 123 (2d Cir. 2011) (citing *Advanced Magnetics, Inc. v. Bayfront Partners, Inc*., 106 F.3d 11, 18 (2d Cir. 1997)).

Plaintiff has claimed that he hasn't received documents relevant to his case and that PACER indicates that he owes 100 dollars. ECF No. 106. It is unclear whether Plaintiff claims that he cannot pay 100 dollars, or that he shouldn't have to pay 100 dollars, or whether he seeks access to PACER, or that the Defendant be ordered to send him certain documents, or that he wants the Court to provide

hard copies of certain documents.[10] It is also unclear which specific documents, or types of documents, Plaintiff is referring to. It is also unclear whether any of these documents will cure the failure to properly allege a misstatement under federal or state law.  However, since Plaintiff is *pro se*, the Court will order that the Plaintiff submit a letter, clarifying what documents he seeks and how he wishes to receive them within two weeks of the date of this Order.

Defendant should file any response one week later. The Court will hold a telephone conference to resolve this issue. After this issue regarding Plaintiff's requested documents is resolved, the Court will give Plaintiff leave to file an amended complaint.

## CONCLUSION

Defendant's motion to dismiss is **GRANTED without prejudice**. The Clerk of the Court is respectfully directed to terminate ECF No. 114. Plaintiff's letter shall be filed on or by **October 13, 2023.** Defendant's response shall be filed one week after Plaintiff's letter is filed.

**SO ORDERED.**

Dated:     **September 29, 2023**
           **New York, New York**

_____
       **ANDREW L. CARTER, JR.**
       **United States District Judge**

---

[10] The Court also notes that shortly after filing his initial complaint, Plaintiff specifically consented to electronic service in this matter. *See* ECF No. 2.